ETHAN JACOBS (SBN 291838)
Ethan Jacobs Law Corporation
ethan@ejacobslaw.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 275-0845

Attorneys for Plaintiff
Tom Lehman

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOM LEHMAN,<br><br>  Plaintiff,<br><br>v.<br><br>MEDIALAB.AI, INC., a Delaware corporation, OTIN HOLDINGS, LLC, a Delaware limited liability company, MICHAEL HEYWARD, an individual, and DOES 1-10, inclusive,<br><br>  Defendants. | Case No.: 2:23-cv-09055<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>**COMPLAINT FOR:**<br>  1. **BREACH OF CONTRACT**<br>  2. **TORTIOUS INTERFERENCE WITH CONTRACT**<br>  3. **FRAUD**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tom Lehman asserts the claims below against Defendants MediaLab.ai, Inc., Otin Holdings, LLC, Michael Heyward, and Does 1-10.

## INTRODUCTION

1. Tom Lehman founded Genius Media Group and agreed to sell it to MediaLab in 2021. As part of the acquisition, MediaLab granted stock to Mr. Lehman, set up an entity to purchase those shares from him at a set price, and promised to fund that entity's purchases. But MediaLab and its Chief Executive

1 | Officer, Michael Heyward, never intended to keep that promise ▮

2 | ▮

3 | 2. When MediaLab bought Genius, it granted Mr. Lehman stock in
4 | MediaLab. At the same time, it created an entity, Otin Holdings, LLC. Otin
5 | Holdings agreed to buy all of Mr. Lehman's MediaLab shares over the course of
6 | two years, and MediaLab agreed to provide Otin Holdings with an irrevocable
7 | standby letter of credit to fund those purchases.

8 | 3. But MediaLab never provided the letter of credit. ▮
9 | ▮
10 | ▮
11 | ▮
12 | ▮
13 | ▮

14 | 4. Thus, MediaLab and Mr. Heyward promised Mr. Lehman that Otin
15 | Holdings would buy Mr. Lehman's shares and that MediaLab would fund the
16 | purchases. But they made that promise knowing MediaLab would only fund the
17 | purchases if ▮ and knowing that MediaLab never
18 | intended to provide Otin Holdings with the letter of credit that would have
19 | allowed Otin Holdings to make those purchases without MediaLab's permission.

20 | 5. ▮
21 | ▮

██████████████████████████.

6. When the time came for Otin and MediaLab to buy Mr. Lehman's remaining MediaLab shares in September 2023, they refused. They did not claim Mr. Lehman had done anything wrong, did not deny their obligations to buy the shares and fund their purchase, and did not claim they lacked the funds to do so. Instead, they pointed to the ████████████████████████████████████ as the reason for their breach of their agreement.

## THE PARTIES

7. Plaintiff Tom Lehman is an individual who lives in Germantown, New York. He is an entrepreneur and businessperson who, among other projects, founded the digital media company Genius.

8. Defendant MediaLab is a Delaware corporation with its headquarters in Los Angeles, California, and is a holding company of consumer internet brands.

9. On information and belief, Defendant Otin Holdings, LLC is a Delaware limited liability company with no physical presence in any state. Plaintiff does not know the identities or citizenship of the members of Otin Holdings other than Brad Brooks, who, on information and belief, lives in Los Angeles, California.

10. Defendant Michael Heyward is an individual who is the Chief Executive Officer of MediaLab who, on information and belief, lives in Los Angeles, California.

11. Defendants Doe 1-10 ("Doe Defendants") are entities that loaned

money to MediaLab.

**JURISDICTION AND VENUE**

12.     Plaintiff is an individual who lives in New York State. Defendant MediaLab is a corporation incorporated under the laws of Delaware whose principal place of business is in Los Angeles, California. Defendant Otin Holdings is a Delaware limited liability company, the citizenship of whose members is not known to Plaintiff, other than Brad Brooks, who, on information and belief, lives in Los Angeles, California. On information and belief, Michael Heyward is an individual who lives in Los Angeles, California. The Doe Defendants are entities that loaned money to MediaLab, and their citizenship is not known to Plaintiff. The amount in controversy exceeds $75,000 exclusive of fees and costs. Accordingly, this Court has diversity jurisdiction under 28 U.S.C. § 1332.

13.     Section 14 of the September 13, 2021 Put Agreement between Mr. Lehman, MediaLab, and Otin Holdings ("Put Agreement") provides that "[a]ny legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

14.     Defendant MediaLab is subject to personal jurisdiction in this Judicial District because its principal place of business is within this District and

State.

15. Defendant Otin Holdings, LLC is subject to personal jurisdiction in this Judicial District because, on information and belief, its principal place of business is within this District and State.

16. Defendant Michael Heyward is subject to personal jurisdiction in this Judicial District because he resides in and does business within this District and State.

17. Plaintiff does not presently know the true names and capacities of the Doe Defendants and therefore sues them by these fictitious names. Plaintiff believes that the Doe Defendants are persons or entities who loaned money to MediaLab and who induced MediaLab to violate its agreements with Plaintiff in violation of his rights. Plaintiff will request leave of Court to amend this Complaint to set forth their true names and identities when he ascertains them.

18. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts, events, and omissions giving rise to Plaintiff's claims occurred in this judicial district.

19. Further, Section 14 of the Put Agreement provides that "[t]he parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in [the federal courts of the United States of America or the courts of the State of Delaware] and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding

brought in any such court has been brought in an inconvenient forum." Thus, MediaLab and Otin Holdings consented to venue in any federal court.

## COMMON FACTUAL ALLEGATIONS

### I. MediaLab Acquires Genius

20. In 2009, Tom Lehman co-founded Genius (then known as Rap Genius) as a website where users could read and decode intricate rap lyrics.

21. Over the decade that followed, Genius grew to become the preeminent song lyrics website, with over 80 million monthly unique visitors.

22. In September 2021, MediaLab acquired Genius for $80 million. At the time of the acquisition, Mr. Lehman was Genius's chief executive officer.

23. As part of the acquisition, MediaLab entered into two agreements with Mr. Lehman: a September 13, 2021 Put Agreement and a September 13, 2021 Employment Agreement.

### II. MediaLab's Failure to Make Retention Bonus Payments

24. Mr. Lehman became an employee of MediaLab immediately following its acquisition of Genius. His primary responsibility has been ensuring the acquisition was successful.

25. On information and belief, Genius is one of MediaLab's most successful acquisitions. Mr. Heyward himself has called Genius the "crown jewel" of MediaLab's portfolio.

26. Among other compensation, MediaLab promised Mr. Lehman in the Employment Agreement a retention bonus paid in four installments: the first due on March 13, 2022, the second on September 13, 2022, the third on March 13, 2023, and the fourth on September 13, 2023.

27. MediaLab paid Mr. Lehman his first and second retention bonus payments on time.

28. But MediaLab did not make the third retention bonus payment when it became due on March 13, 2023.

29. When he did not receive his third retention payment by the March 13 deadline, Mr. Lehman asked members of MediaLab's executive team why the company had not paid it. They told Mr. Lehman that ███████████████ ███████████████████████████████████████████████████████████ ███. MediaLab did not claim that Mr. Lehman had done anything that would affect his right to the third retention bonus payment, did not dispute that Mr. Lehman was entitled to that payment, did not dispute that the payment was due on March 13, 2023, and did not claim MediaLab lacked the funds to pay it.

30. ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████. When Mr. Lehman ███

[REDACTED] followed up with Mr. Heyward on April 11. Mr. Lehman did not receive a response until May 13, more than a month later.

31. On May 14, Mr. Lehman and Mr. Heyward discussed the bonus payment over the phone. Mr. Lehman's understanding of Mr. Heyward's remarks was that MediaLab was prepared to pay Mr. Lehman in full in the next four to six weeks and would make a "meaningful" partial payment on June 1. But when Mr. Lehman attempted to confirm this understanding in writing, Mr. Heyward refused to commit to paying Mr. Lehman's bonus in four to six weeks and refused to commit to making a partial payment by June 1. Mr. Heyward did, however, identify September 13, 2023 as the "outside date" for paying the bonus.

32. On information and belief, [REDACTED]

33. On June 8, 2023, Mr. Lehman brought an arbitration before JAMS to enforce the Employment Agreement.

34. On September 13, 2023, with Mr. Lehman's third retention bonus payment still unpaid, MediaLab failed to make Mr. Lehman's fourth retention bonus payment.

III. **MediaLab's Failure to Fund the Repurchase of Mr. Lehman's MediaLab Shares**

35. Section 1(a) of the Put Agreement sets out the schedule under which Otin Holdings is obligated to purchase Mr. Lehman's shares of MediaLab's

common stock at a pre-determined price. According to this schedule, Otin Holdings was required to purchase all shares currently owned by Mr. Lehman on September 13, 2023.

36. Section 3 of the Put Agreement obligated MediaLab to provide Otin Holdings with an irrevocable standby letter of credit to fund its purchase of MediaLab shares from Mr. Lehman.

37. In Section 5 of the Put Agreement, MediaLab provided a series of representations, including that "MediaLab shall take such necessary action to fund amounts drawn pursuant to the Letter of Credit" and that "MediaLab will not violate any law, agreement or contract by providing or funding the Letter of Credit as contemplated by Section 3."

38. Before September 2023, MediaLab, rather than Otin, purchased Mr. Lehman's MediaLab shares according to the schedule and terms set out in Section 1(a) of the Put Agreement.

39. On approximately August 8, 2023, Mr. Heyward agreed to purchase a portion of Mr. Lehman's MediaLab shares in exchange for Mr. Lehman staying his arbitration against MediaLab through September 13, 2023.

40. After Mr. Heyward's purchase was concluded, Mr. Lehman still owned a large number of MediaLab shares that Otin Holdings was obligated to purchase on September 13, 2023.

41. On September 13, 2023, neither Otin Holdings nor MediaLab

purchased Mr. Lehman's MediaLab's shares. The amount Otin Holdings was supposed to pay for Mr. Lehman's remaining MediaLab shares is more than $75,000.

42. Although Brad Brooks signed the Put Agreement on behalf of Otin Holdings, Section 7 of the Put Agreement identifies Mr. Heyward as the contact for Otin Holdings at MediaLab's physical address and at Mr. Heyward's MediaLab email address.

43. On information and belief, Mr. Brooks is Mr. Heyward's business partner and is a member of MediaLab's board of directors.

44. On September 14, 2023, counsel for Mr. Lehman sent an email to Mr. Heyward as required by Section 7 of the Put Agreement. That email said, in relevant part:

> I am writing on behalf of Tom Lehman to demand that Otin Holdings, LLC and MediaLab.Ai, Inc. immediately comply with their obligations under Section 1(a)(vii) of the September 13, 2021 Put Agreement by purchasing Mr. Lehman's remaining … MediaLab shares …. The deadline for Otin to complete its purchase was yesterday, September 13, 2023. *See* Put Agreement, Sections 1(a)(vii), 1(c).
>
> Mr. Lehman further demands that Otin and MediaLab provide evidence that MediaLab issued the irrevocable standby letter of credit required under Section 3 of the Put Agreement. If MediaLab did not provide that letter of credit, it would appear that Otin, MediaLab, and you personally procured the Put Agreement by fraud.

45. MediaLab ignored the September 13 request to provide evidence that it had issued the letter of credit. It also ignored further requests for that evidence.

46. MediaLab's excuse in September was the same as when it failed to make Mr. Lehman's March 13, 2023 retention bonus payment. It told Mr. Lehman that it could not fund the purchase of Mr. Lehman's MediaLab shares as required by the Put Agreement not because it was not obligated to do so or because it lacked the funds, but because ████████████████████████████████████████ ████████████████████████████████████████.

47. On information and belief, MediaLab's ████████████████ ████████████████████████████████████████ on or before September 13, 2021, the effective date of the Put Agreement.

48. On information and belief, the lenders ████████████████ ████████████████████████████ were aware of MediaLab's contractual obligation to fund the purchase of Mr. Lehman's MediaLab shares when ████████████████████████████████████████ ████████████████████████████████████████ ████████.

49. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████.

50. Further, MediaLab and Mr. Heyward concealed ████████ from Mr. Lehman when Otin Holdings promised to purchase Mr. Lehman's MediaLab

shares—and MediaLab promised to fund those purchases—in order to induce Mr. Lehman to agree to enter into the Put Agreement.

51. MediaLab personnel have also explained that in 2023, MediaLab's lenders have ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████

### IV. Mr. Lehman's Employment with MediaLab Ends

52. On September 25, 2023, Mr. Lehman provided notice to MediaLab that its failure to pay his retention bonus was a breach of the Employment Agreement and that he would resign for "Good Reason" after the 30-day cure period if MediaLab did not pay it.

53. At approximately 10:00 p.m. on October 25—the last day of MediaLab's cure period—MediaLab emailed Mr. Lehman that it would be the last day of his employment.

### FIRST CAUSE OF ACTION

**(Breach of Written Contract – Against MediaLab and Otin Holdings)**

54. All of the allegations above are incorporated by reference.

55. Mr. Lehman performed each and every covenant, condition, and obligation to be performed by him under the Put Agreement.

56. Mr. Lehman has not excused, waived, or otherwise released MediaLab

or Otin Holdings from their obligations under the Put Agreement.

57.  MediaLab and Otin Holdings have failed to meet their obligations under the Put Agreement.

58.  Otin Holdings breached its obligations under the Put Agreement by failing to purchase Mr. Lehman's MediaLab shares on or before September 13, 2023.

59.  MediaLab breached its obligations under the Put Agreement by failing to issue and fund the letter of credit to Otin Holdings.

60.  Mr. Lehman has been damaged as a direct and proximate result of MediaLab and Otin Holdings' breach of the Put Agreement.

### SECOND CAUSE OF ACTION

**(Tortious Interference with Contract – Against Does 1-10)**

61.  All of the allegations above are incorporated by reference.

62.  The Doe Defendants interfered with MediaLab's contract knowingly and with the intent to cause MediaLab to breach its agreement with Mr. Lehman.

63.  On information and belief, the Doe Defendants, knowing that MediaLab had a contractual obligation to Mr. Lehman to fund the purchase of his MediaLab shares, ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

64. Further, on information and belief, the Doe Defendants, knowing that MediaLab had a contractual obligation to Mr. Lehman to fund the purchase of his MediaLab shares, separately ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

65. MediaLab did breach its obligation to Mr. Lehman under the Put Agreement, and in communications with Mr. Lehman explicitly referenced ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as the reason.

66. Mr. Lehman was harmed by the Doe Defendants' conduct.

67. On information and belief, each of the acts of interference was done willfully and maliciously by the Doe Defendants, with the deliberate intent to improve its own business and for financial gain, thereby entitling Mr. Lehman to punitive damages to be proven at trial.

### THIRD CAUSE OF ACTION

**(Fraud – Cal. Civ. Code §§ 1572, 1709, and 1710 – Against MediaLab, Otin Holdings, and Heyward)**

68. All of the allegations above are incorporated by reference.

69. On information and belief, MediaLab, Otin Holdings, and Mr. Heyward promised Mr. Lehman through the Put Agreement that Otin Holdings would purchase Mr. Lehman's MediaLab shares and that MediaLab would fund

those purchases and intended not to perform at the time those promises were made.

70. Specifically, on information and belief, MediaLab, Otin Holdings, and Mr. Heyward knew at the time they induced Mr. Lehman to enter into the Put Agreement that MediaLab ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

71. On information and belief, MediaLab, Otin Holdings, and Mr. Heyward's false promises were intended to deceive or induce Mr. Lehman to enter into the Put Agreement.

72. Mr. Lehman reasonably relied on MediaLab, Otin Holdings, and Mr. Heyward's promises.

73. MediaLab broke its promise to fund Otin Holdings' purchase of Mr. Lehman's MediaLab shares, and Otin Holdings broke its promise to make the purchases.

74. Mr. Lehman was harmed when MediaLab and Otin Holdings did not purchase his MediaLab shares on September 13, 2023 as required by the Put Agreement.

75. MediaLab, Otin Holdings, and Heyward's misrepresentations were intentional, thereby entitling Mr. Lehman to punitive damages to be proven at trial.

WHEREFORE, Plaintiff Tom Lehman seeks judgment as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Lehman demands judgment on all counts of this Complaint and an award of monetary relief against Defendants as follows:

1. compensatory damages, general and/or special, directly and proximately resulting from Defendants' wrongful acts, in an amount to be determined at trial;

2. costs of suit;

3. punitive and exemplary damages for the claims for tortious interference with contract and fraud;

4. awardable interest at the maximum legal rate; and

5. entry of an Order for any further relief as the Court may deem just and proper.

Dated: October 26, 2023        ETHAN JACOBS LAW CORPORATION

                               By:   /s/ Ethan Jacobs
                                     ETHAN JACOBS
                                     Attorneys for Plaintiff
                                     Tom Lehman

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Tom Lehman hereby demands trial by jury in this action on any issue triable of right by a jury.

Dated: October 26, 2023         ETHAN JACOBS LAW CORPORATION

                                By:   /s/ Ethan Jacobs
                                      ETHAN JACOBS
                                      Attorneys for Plaintiff
                                      Tom Lehman